UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNON PETERSEN, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>NATERA, INC.,<br><br>   Defendant. | Case No. 24-cv-07062-JST<br><br>**ORDER GRANTING MOTION TO DISMISS; DENYING MOTION TO CONTINUE**<br><br>Re: ECF Nos. 25, 45 |

Before the Court is Defendant Natera, Inc.'s motion to dismiss. ECF No. 25. The Court will grant the motion.

## I. BACKGROUND

Plaintiffs Shannon Petersen and Erin Vedrode bring this lawsuit based on Natera's allegedly "false, deceptive, unfair, and misleading advertising, marketing, and promotion of [its] preimplantation genetic testing for aneuploidy ('PGT-A' or 'PGT-A testing')," which Natera markets as Spectrum. ECF No. 1 ¶¶ 1, 74. They seek to represent a nationwide class of consumers, as well as classes of consumers in the states where they reside—California for Petersen and Michigan for Vedrode.

The complaint alleges the following:

> PGT-A testing is marketed and sold by Defendant as an add-on to the IVF [in vitro fertilization] process and purports to screen embryos for chromosomal abnormalities. With respect to PGT-A conducted by Defendant, IVF clinics perform a biopsy and send a small number of cells from the embryo to Defendant who performs the PGT-A testing and provides results to the customer and their clinic. The results purport to determine which embryos are "euploid" or best suited for implantation and which embryos are "aneuploid" or abnormal and not suited for implantation.

> PGT-A testing is marketed and sold by Defendant to people pursuing IVF as increasing the chance of embryo implantation, decreasing the chance of miscarriage, reducing the time to pregnancy, increasing the rate of pregnancy, increasing live birth rates, improving the chance of a healthy pregnancy, and improving pregnancy rates for all ages, especially those of advanced maternal age which Defendant identifies as over 35 years old. Defendant also markets PGT-A as being 99% accurate. Based on these material representations and the material omissions that underlay them as detailed below, Plaintiffs and Class members choose to purchase PGT-A testing from Defendants.
>
> The above representations by Defendant are false and/or misleading and deceptive based upon the omission of material information. Studies show that when looking at clinic pregnancy, miscarriage, or live-birth rates, there is no difference between cycles utilizing PGT-A and cycles not utilizing PGT-A. Studies also show the accuracy rating for PGT-A is significantly lower than advertised.

*Id.* ¶¶ 9–11 (paragraph numbers omitted).

Natera's website advertises that Spectrum "can: Increase the chance of embryo implantation; Decrease the chance of miscarriage; Reduce the time to pregnancy; and Reduce the chance of having a child with a chromosomal abnormality or single gene condition." *Id.* ¶ 185 (semicolons added). It further claims that Spectrum is "Proven to boost IVF success," *id.* ¶ 196; that Spectrum "helps reduce time to pregnancy and improve the chance of a successful pregnancy, while decreasing the chance of miscarriage or having a child with a genetic condition," *id.* ¶ 207; and that "PGT-A and PGT-M can improve the chance of a health pregnancy," *id.* ¶ 210.[1] Additionally, the website states:

> Spectrum™ PGT-A from Natera has been studied to learn whether it helped people achieve their goal of a healthy pregnancy. Study results showed that PGT-A improves pregnancy rates for parents of all ages. Spectrum uses advanced genetic technology to screen all 24 chromosomes in a cell (22 chromosome pairs and the sex chromosomes X and Y).

*Id.* ¶ 223 (footnote omitted).

The patient brochure states, "Spectrum informs embryo selection by combining PGT-M and PGT-A testing with a typical accuracy of greater than 99%," *id.* ¶ 193, and it previously stated, "Pregnancy rates are higher when Spectrum is performed with IVF," *id.* ¶ 198. The

---

[1] The complaint does not define PGT-M, which appears to refer to preimplantation genetic testing for monogenic conditions.

brochure also advertises that Spectrum is "[d]esigned to improve the chance of a healthy pregnancy." *Id.* ¶ 209.

Citing various scientific studies and articles, Plaintiffs allege that Natera's statements are false or misleading. For example, one 2016 study "concluded that while the study was small, it suggested a potential false positive rate of almost 55% and an intra-embryo discrepancy of almost 50%." *Id.* ¶ 96. Another 2016 study "found that 33% of embryos originally reported to be 'aneuploid' were found to be 'euploid' upon repeat assessment." *Id.* ¶ 100. A 2020 study "found that PGT-A resulted in a lower chance of live birth in all age groups compared to transfer of embryos without PGT-A." *Id.* ¶ 132. And a 2023 analysis:

> determined that when the research data utilized all IVF cycles, and not just the ones where there was a transferrable embryo following PGT-A, there was actually a threefold increase in live birth rates for the group that did not have PGT-A testing performed, and a reduction in live birth rates for the group where PGT-A testing was utilized.

*Id.* ¶ 151. Plaintiffs also allege that the American Society for Reproductive Medicine ("ASRM") and the Society for Assisted Reproductive Technology ("SART") have opined that the value of PGT-A "as a screening test for IVF patients has yet to be determined" or "had not been demonstrated." *Id.* ¶ 120 (2018); *id.* ¶¶ 162–64 (November 2023); *id.* ¶¶ 176–80 (May 2024). In May 2024, "ASRM stated that the value of PGT-A to lower the risk of clinical miscarriage was unclear and raised concerns about the studies and trials performed. ASRM cautioned that large, prospective, well-controlled studies in a more inclusive patient population are needed." *Id.* ¶ 179.

Finally, Plaintiffs allege that Natera "claims that embryo biopsy and PGT-A are nearly harmless," but there is evidence that "damage to embryos caused by biopsy may be the reason for unsuccessful IVF outcomes following PGT-A." *Id.* ¶ 230.

Both Petersen and Vedrode purchased Natera's PGT-A testing "in or around November 2022," with Petersen having paid $700 and Vedrode having paid $2250 "plus additional costs." *Id.* ¶¶ 249–50, 252–53.[2] They relied on Natera's statements "that PGT-A

---

[2] The complaint contains two sets of paragraphs numbered 242–66. ECF No. 1 at 45–53. The citations in this paragraph are to the first paragraphs so numbered, appearing on pages 46–47.

3

testing is greater than 99% accurate, increases the success of IVF, decreases the chance of miscarriage, leads to a higher chance of pregnancy, reduces the time to pregnancy, and increase the chance of implantation and pregnancy," and they "would not have purchased [the testing] absent Defendant's false and misleading misrepresentations and omissions." *Id.* ¶¶ 248, 250–51, 253.

On the basis of the above allegations, Plaintiffs bring claims for: (1) violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, under the unfair and fraudulent prongs; (2) violation of the UCL under the unlawful prong; (3) violation of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (4) violation of the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws §§ 445.901, *et seq.*; (5) breach of the implied warranty of merchantability; (6) breach of the implied warranty of usability; (7) breach of express warranty; (8) fraud; (9) fraud by concealment; and (10) unjust enrichment.

## II.  JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1332(d)(2).

## III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). In addition, a party "alleging fraud or mistake" must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Even if "fraud is not a necessary element of a claim":

> the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).

"Dismissal under Rule 12(b)(6) [of the Federal Rules of Civil Procedure] is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

4

true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). Dismissal for failure to state a claim should be with leave to amend, "even if no request to amend the pleading was made, unless [the court] determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (per curiam).

## IV. REQUESTS FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Judicial notice and incorporation by reference are exceptions to this rule.[3] *Id.* The Ninth Circuit has cautioned against the "overuse and improper application" of these exceptions and warned that the "use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Id.*

A court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Although "a court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment," it "cannot take judicial notice of

---

[3] Natera argues "that a court may take judicial notice of documents that are incorporated by reference into a complaint" if certain criteria are satisfied. ECF No. 26 at 3. However, judicial notice and incorporation by reference are separate doctrines. "Both of these procedures permit district courts to consider materials outside a complaint, but each does so for different reasons and in different ways." *Khoja*, 899 F.3d at 998.

5

disputed facts contained in such public records." *Khoja*, 899 F.3d at 999 (citation modified).

A court may consider a document as incorporated by reference into a complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "But the mere mention of the existence of a document is insufficient to incorporate the contents of a document," and incorporation by reference is appropriate only where "the document's authenticity is not in question and there are no disputed issues as to the document's relevance." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). In addition, while a court may generally assume the contents of an incorporated document to be true for purposes of a motion to dismiss, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003.

Natera seeks consideration of three categories of documents outside the complaint: consent forms signed by Plaintiffs to receive PGT-A testing; scientific studies or articles cited in the complaint; and clinical laboratory licenses issued to Natera by the California Department of Public Health. ECF No. 26.

### A.  Consent Forms

First, Natera argues that Plaintiffs' consent forms are "referenced in Plaintiffs' complaint as one of the media through which Natera allegedly defrauded them." ECF No. 26 at 4. Plaintiffs counter that the forms "are barely addressed in Plaintiffs' Complaint and do not form the basis of the Complaint." ECF No. 35 at 3. While the complaint does not quote from the consent forms, Plaintiffs' breach of express warranty and fraud by concealment claims explicitly rely on statements made on those forms. ECF No. 1 ¶ 312 (alleging, as part of breach of express warranty claim, that "Defendant purports, through its marketing and advertising, patient brochure, *consent forms*, statements, and test results that its PGT-A testing is accurate and reliable, among other things as detailed here" (emphasis added)); *id.* ¶ 332 (alleging, as part of fraud by concealment claim, that "Defendant had a duty to disclose the truth about PGT-A because, through Defendant's advertising, marketing, website statements, patient brochures, *consent form*, and other written statements made to consumers, Defendant made partial representations regarding PGT-A

including purported representations concerning its reliability and accuracy, but failed to disclose facts that would have materially qualified those partial representations" (emphasis added)). The complaint therefore incorporates the consent forms by reference. Because Plaintiffs do not challenge the forms' authenticity, the Court will consider them on this motion to dismiss. However, the Court will not consider the contents of the forms as evidence of the truth of the statements contained therein. *Khoja*, 899 F.3d at 1003.

### B. Studies and Articles

Second, Natera asks the Court to consider seven "sources cited in Plaintiffs' complaint as contradicting Natera's statements regarding PGT-A." ECF No. 26 at 4. Plaintiffs do not dispute that they "have incorporated dozens of scholarly articles in the Complaint," ECF No. 35 at 4, nor do they dispute that these articles include the seven sources cited by Natera. The Court considers the articles as having been incorporated by reference into the complaint but, as discussed below, does not interpret these "extrinsic documents to resolve competing theories against the complaint." *Khoja*, 899 F.3d at 998.

### C. Clinical Laboratory Licenses

Finally, Natera asks the Court to take judicial notice of clinical licenses issued by the California Department of Public Health. ECF Nos. 26-11 to 26-15. Plaintiffs do not contest the fact or authenticity of these licenses but argue that they are irrelevant. However, as explained below, the Court finds the licenses relevant to determining whether Plaintiffs' punitive damages claims may move forward. The Court therefore takes judicial notice of the licenses. *See, e.g.*, *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 n.5 (9th Cir. 2018) (granting "motion to take judicial notice of government documents . . . and undisputed matters of public record").

## V.  DISCUSSION

### A. Pleading with Specificity

Plaintiffs acknowledge that their claims for fraud and fraud by concealment, as well as portions of their UCL claims, "allege fraudulent conduct" are therefore subject to the specific pleading requirements of Rule 9(b). ECF No. 34 at 12. They argue that the rule does not apply to

7

all of their UCL claims because "the UCL prohibits business practices that are (1) unlawful, (2) unfair, *or* (3) fraudulent," and they "assert their UCL claims under all three prongs." *Id.* (emphasis in original). But Plaintiffs' argument continues by relying on Natera's alleged "misleading statements and omissions," *id.*—i.e., its allegedly fraudulent conduct—and the Court agrees with Natera that all of Plaintiffs' UCL claims therefore sound in fraud.

Plaintiffs do not make any arguments regarding whether their remaining claims sound in fraud, but the Court's review of the complaint indicates that they do. For example, Plaintiffs' implied warranty of merchantability claim is based on allegations that "Natera advertises, markets, and promotes that PGT-A testing is substantiated, accurate and reliable" when "it is not." ECF No. 1 ¶ 295. Similarly, Plaintiffs allege that Natera's "promises and affirmations of fact about PGT-A testing through its marketing and advertising statements, patient brochure, Consent Form, [and] test results" created "express warranties about accuracy and reliability," which Natera allegedly breached because "its PGT-A testing is not accurate or reliable." *Id.* ¶¶ 310–13. Because all of Plaintiffs' claims rest on the same alleged "unified course of fraudulent conduct," the entire complaint sounds in fraud and is subject to Rule 9(b)'s pleading requirements. *Vess*, 317 F.3d at 1103.

To comply with Rule 9(b), a complaint "must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (citation modified). This includes "identify[ing] the allegedly misleading representations that each [Plaintiff] saw and relied upon in deciding to purchase" Spectrum. *In re Natera Prenatal Testing Litig.*, 664 F. Supp. 3d 995, 1006 (N.D. Cal. 2023).

Plaintiffs have not satisfied these requirements. The complaint alleges that both Petersen and Vedrode "purchased Defendant's PGT-A testing in or around November 2022" and identifies categories of allegedly false and misleading statements—"that PGT-A testing is greater than 99% accurate, increases the success of IVF, decreases the chance of miscarriage, leads to a higher chance of pregnancy, reduces the time to pregnancy, and increases the chance of implantation and pregnancy"—on which they allegedly based their purchases. ECF No. 1 ¶¶ 248–49, 251–52.

8

However, as Natera correctly observes, the complaint alleges only the approximate dates of purchase and not when Plaintiffs viewed the alleged statements or where they viewed them (e.g., on the website, in a marketing brochure, or elsewhere). Additionally, Plaintiffs cite to different versions of Natera's brochure, and the complaint is unclear as to whether all of the alleged statements were in the version available prior to Plaintiffs' purchases. For example, Plaintiffs cite to an online brochure last visited on July 7, 2023, to support an allegation that Natera "previously promoted its Spectrum PGT-A testing as increasing pregnancy rates," ECF No. 1 ¶ 198 & n.95, but they cite to a version last visited on October 8, 2024, to support their contention that Natera "misleadingly states that its PGT-A testing [is] greater than 99% accurate," *id.* ¶ 193 & n.91. Neither of these statements appears in the current version of the brochure available at the cited link, and it is not clear whether they were included in the brochure prior to Plaintiffs' purchases. https://www.natera.com/resource-library/spectrum/spectrum-pgt-a-patient-brochure/ [https://perma.cc/229P-4KSS].

Likewise, the complaint cites to Natera's website as last visited on October 8, 2024, the date the complaint was filed and nearly two years after Plaintiffs allegedly purchased Spectrum, *e.g.*, ECF No. 1 ¶ 185 & n. 89, ¶ 192 & n.90, ¶ 206 & n.102, ¶ 212 & 17, and Plaintiffs do not allege that the cited statements appeared on Natera's website prior to Plaintiffs' purchases, or even that Plaintiffs viewed the website prior to purchasing. Also, some of the sources relied on by Plaintiffs to allege that Natera's statements were false or misleading postdate Plaintiffs' purchases, which means they cannot support Plaintiffs' allegations that the alleged statements were false or misleading at the time Plaintiffs might have relied on them. *E.g.*, *id.* ¶ 204 & n.100, ¶ 211 & n.106, ¶ 222 & n.114, ¶ 227 & n.119.

For all of the above reasons, Plaintiffs' allegations fall short of the heightened pleading required by Rule 9(b), and the Court dismisses Plaintiffs' claims with leave to amend.

## B. Remaining Arguments

The Court addresses the remainder of the parties' arguments to provide guidance to Plaintiffs as they consider whether and, if so, how to amend their complaint. However, the Court

9

does not address two arguments that Natera "raised only in footnotes."[4] *Estate of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) (declining to address argument raised only in footnotes because such arguments "are generally deemed waived"); *see also Sanders v. Sodexo, Inc.*, No. 2:15-cv-00371-JAD-GWF, 2015 WL 4477697, at *5 (D. Nev. July 20, 2015) ("Many courts will disregard arguments raised exclusively in footnotes." (quoting Bryan Garner, *The Redbook: A Manual on Legal Style* 168 (3d ed. 2013))).

### 1. Actionability of Claims

Natera argues that the Court should dismiss Plaintiffs' claims because sources incorporated by reference into the complaint contradict the complaint's allegations. However, "heeding the Ninth Circuit's warning in *Khoja* regarding the overuse of incorporation-by-reference, the Court declines to use these extrinsic documents to resolve competing theories against the complaint and risk premature dismissals of plausible claims that may turn out to be valid after discovery." *Sneed v. Procter & Gamble Co.*, No. 23-cv-05443-JST, ___ F. Supp. 3d ___, 2025 WL 1017933, at *6 (N.D. Cal. Apr. 4, 2025) (citation modified). This is not a case where the sources relied on by Natera "plainly refute the allegations in the complaint." *Locklin v. StriVectin Operating Co.*, No. 21-cv-07967-VC, 2022 WL 867248, at *4 (N.D. Cal. Mar. 23, 2022). For example, Natera cites one study as "stating PGT-A 'is a proven intervention in the treatment of infertility' that 'increases the success of IVF.'" ECF No. 25 at 18 (quoting ECF No. 26-4 at 2). But that study also noted that "the diagnostic predictive value of PGT-A, when considering embryonic mosaicism, or segmental imbalance remains controversial," ECF No. 26-4 at 2 (footnotes omitted). Similarly, Natera cites a study that "acknowledges the[] potential benefits of PGT-A" as including increased pregnancy rates, ECF No. 25 at 18 (citing ECF No. 26-6 at 15–16), but Natera fails to consider the entire passage, which states, "The supposition that PGT-A reduces miscarriages or time-to-pregnancy in specific patient groups, such as those with advanced maternal age, is based on *post hoc* analyses *and requires further investigation to establish its validity*." ECF No. 26-6 at 15–16

---

[4] These arguments are that Plaintiffs' claim for breach of the implied warranty of usability should be dismissed as duplicative of their claim for breach of the implied warranty of merchantability, and that Plaintiffs' unjust enrichment claim should be dismissed on grounds that it "is not a standalone cause of action in California." ECF No. 25 at 19 n.8, 31 n.9; ECF No. 38 at 5 n.1.

(citation omitted and emphasis added).  Put simply, "[Natera's] interpretation of the studies requires the Court to draw inferences in its favor, whereas the Court must draw all reasonable inferences in [Plaintiffs'] favor at the motion to dismiss stage."  *Graham v. Cent. Garden & Pet Co.*, No. 22-cv-06507-JSC, 2023 WL 2744391, at *2 (N.D. Cal. Mar. 30, 2023).

In addition, the Court is not persuaded by Natera's reliance on *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, in which the Second Circuit held that "statements of scientific conclusions about unsettled matters of scientific debate cannot give rise to liability for damages sounding in defamation."  720 F.3d 490, 492 (2d Cir. 2013).  The court elaborated that, "to the extent a speaker or author draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement, those statements are not grounds for a claim of false advertising."  *Id.* at 498.  Natera fails to cite a decision from the Fifth Circuit, declining to apply the holding of *ONY* where the plaintiff "did not sue [defendants] for publishing an article in a scientific journal" and instead "sought to enjoin statements made in commercial advertisements and directed at customers."  *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 236 (5th Cir. 2014).  Nor did it cite district court decisions explaining that "the scope of the privilege adopted in *ONY* is relatively narrow," *Hi-Tech Pharms., Inc. v. Cohen*, 277 F. Supp. 3d 236, 245 (D. Mass. 2016), or that "[t]he Ninth Circuit has not embraced the deferential approach employed in *ONY*," *Guardant Health, Inc. v. Natera, Inc.*, 580 F. Supp. 3d 691, 701 (N.D. Cal. 2022).

Natera further argues that not all of its alleged statements can support claims based on fraud or misrepresentation.  For example, it argues that statements about what "[s]ome studies have shown" are not false because Plaintiffs do not allege "that such studies do not exist or were falsified."  ECF No. 25 at 16 (citing ECF No. 1 ¶ 206).  Plaintiffs' opposition brief offers no response to that argument, which Plaintiffs should consider if they choose to amend the complaint.

### 2. Duty to Disclose

Natera also argues that it had no duty to disclose any of the information Plaintiffs contend should have been disclosed.  Under California law:

> There are four circumstances in which nondisclosure or concealment

11

> may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.

*LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997) (citation modified).  The complaint sufficiently alleges a duty under the fourth circumstance.  Plaintiffs allege that Natera made representations regarding Spectrum's accuracy rates and benefits, but that it failed to disclose that studies "show that when looking at clinic pregnancy, miscarriage, or live-birth rates, there is no difference between cycles utilizing PGT-A and cycles not utilizing PGT-A" and that "the accuracy rating for PGT-A is significantly lower than advertised." ECF No. 1 ¶ 11; *see also id.* ¶ 189–90 (alleging statements Plaintiffs contend were false or misleading, followed by material facts that Plaintiffs contend were omitted); *id.* ¶ 230 (alleging that Natera "claims that embryo biopsy and PGT-A are nearly harmless" but "omits to inform consumers of the fact that damage to embryos caused by biopsy may be the reason for unsuccessful IVF outcomes following PGT-A"). These allegations are sufficient to withstand Natera's challenge to the pleadings on grounds that it did not have a duty to disclose.

### 3. Learned Intermediary Doctrine

Next, Natera argues that Plaintiffs' claims are barred by the learned intermediary doctrine, which "provides that manufacturers have a duty to warn physicians, but not the physicians' patients, about certain risks accompanying use of their prescription drugs and many medical devices." *Himes v. Somatics, LLC*, 16 Cal. 5th 209, 221 (2024).  When the doctrine applies:

> the manufacturer fulfills its general duty of care owed to the patient by providing an adequate warning to the patient's physician.  If the manufacturer fails to provide an adequate warning to the patient's physician, then the patient may sue asserting negligence for breach of its general duty of care or asserting strict liability for marketing a product that has been rendered defective due to the inadequate warning.

*Id.* at 222.

Plaintiffs do not dispute that a consumer cannot directly purchase Spectrum and must instead work with a healthcare provider to receive the testing.  But they correctly observe that this Court has already determined that the learned intermediary doctrine does not apply to consumer

12

fraud claims that are not "simply disguised failure-to-warn claims":

> The Court is not persuaded that the learned intermediary doctrine should apply to Plaintiffs' California consumer fraud claims. Natera cites no cases in which California courts have applied this doctrine to consumer protection claims. The two federal district courts that have applied the learned intermediary doctrine to consumer protection claims based its application on the similarities between the claims before them and products liability failure-to-warn claims. Assuming for the sake of argument that, under California law, the learned intermediary doctrine should apply to Plaintiffs' consumer protection claims, Natera does not articulate why this Court should understand Plaintiffs' claims as "essentially" failure-to-warn claims. *See Saavedra* [*v. Eli Lilly & Co.*, No. 12-cv-9366-SVW-MAN], 2013 WL 3148923, at *3 [(C.D. Cal. June 13, 2013)]. Plaintiffs do not suggest that Panorama posed any undisclosed safety risk to patients. *See Brown v. Super. Ct.*, 44 Cal. 3d 1049, 1065, 245 Cal. Rptr. 412, 751 P.2d 470 (1988) ("A product may be defective because of the absence of a warning that was necessary to allow its safe use."). Rather, Plaintiffs allege that Natera failed to disclose that Panorama could not reliably screen for many of the conditions for which it was advertised. Because Plaintiffs' claims are not simply disguised failure-to-warn claims, the learned intermediary doctrine should not apply to Plaintiffs' California consumer protection claims.

*In re Natera Prenatal Testing*, 664 F. Supp. 3d at 1007–08. Natera has not persuaded the Court to reconsider its prior legal conclusions.

Applying those conclusions to this case, the Court agrees with Plaintiffs that they generally "allege that Defendant materially misrepresented PGT-A capabilities, reliability, and limitations," which are not failure-to-warn claims in disguise. ECF No. 34 at 18. However, one claim might be distinguishable to the extent it suggests an "undisclosed safety risk," *In re Natera Prenatal Testing*, 664 F. Supp. 3d at 1007: the allegation that Natera failed "to inform consumers of the fact that damage to embryos caused by biopsy may be the reason for unsuccessful IVF outcomes following PGT-A." ECF No. 1 ¶ 230. If Plaintiffs file an amended complaint, they shall apply the learned intermediary doctrine when framing allegations regarding that particular omission.

### 4. MCPA

Natera argues that Vedrode's MCPA claim fails as a matter of law because the MCPA "does not apply to . . . [a] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States," Mich. Comp. Laws § 445.904(1)(a), and Natera has been certified by the United States

Department of Health and Human Services through the Clinical Laboratory Improvement Amendments ("CLIA"). However, although Natera provided copies of licenses from the California Department of Public Health, ECF Nos. 26-11 to 26-14, it has not submitted any certifications from the federal government. Natera cites to Plaintiffs' consent forms, which state, "Spectrum tests have been developed and their performance characteristics determined by the CLIA-certified laboratory performing the test." *E.g.*, ECF No. 26-2 at 6; ECF No. 26-3 at 3. But this is insufficient because, while the Court considers the consent forms as having been incorporated by reference into the complaint, it does not take as true all statements contained therein. Based on the record properly before it on this motion to dismiss, the Court cannot conclude that Natera has been certified by the federal government.

However, if Natera is CLIA-certified, it appears that the cited MCPA exemption would apply. The Michigan Supreme Court has described the exemption as "broad" and explained "that the relevant inquiry is not whether the specific misconduct alleged by the plaintiffs is 'specifically authorized.' Rather, it is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited." *Smith v. Globe Life Ins. Co.*, 460 Mich. 446, 465, 466 (1999). Thus, for example, a real estate broker is not exempt from the MCPA for providing allegedly usurious mortgage loans "because the transaction at issue, mortgage writing, was not 'specifically authorized' under the [defendants'] real estate broker's license." *Id.* at 463–64 (citing *Att'y Gen. v. Diamond Mortg.*, 414 Mich. 603, 617 (1982)). That is, "the defendants engaged in activity, mortgage writing, that their real estate broker license simply did not permit them to do." *Liss v. Lewiston-Richards, Inc.*, 478 Mich. 203, 215 (2007). By contrast, "the MCPA exemption applies to residential home builders who engage in the type of activities that define a residential home builder, which activities are permitted by the [Michigan Occupational Code] to be performed only by licensed residential home builders." *Id.*

In this case, 42 U.S.C. § 263a(b) provides, "No person may solicit or accept materials derived from the human body for laboratory examination or other procedure unless there is in effect for the laboratory a certificate issued by the Secretary under this section applicable to the category of examinations or procedures which includes such examination or procedure." To

14

obtain certification, a laboratory must provide the Secretary of Health and Human Services "with satisfactory assurances that the laboratory will be operated in accordance with standards issued by the Secretary." 42 U.S.C. § 263a(d). Those standards are designed "to assure consistent performance by laboratories issued a certificate under this section of valid and reliable laboratory examinations and other procedures." 42 U.S.C. § 263a(f). They include a requirement that a laboratory that "introduces a test system not subject to FDA clearance or approval (including methods developed in-house and standardized methods such as text book procedures) . . . must, before reporting patient test results, establish for each test system [certain] performance specifications," including accuracy, precision, and analytical sensitivity. 42 C.F.R. § 493.1253(b)(2).

Vedrode is correct that nothing in the CLIA certification scheme specifically authorizes PGT-A testing, but that argument speaks to the "specific misconduct alleged by the plaintiffs" and not the "general transaction." *Smith*, 460 Mich. at 465. Although Plaintiffs "allege that [Natera] . . . made multiple misrepresentations, the fact remains that all of the alleged misconduct occurred during the course of the *authorized* conduct" of performing tests on materials derived from the human body. *Liss*, 478 Mich. at 215 n.41 (emphasis in original). As in *Liss*, the alleged activity can "be performed only by" certified laboratories, which makes the activity "specifically authorized" for purposes of construing the MCPA exemption. *Id.* at 215. Consequently, assuming Natera is CLIA-certified, the MCPA would not apply to the alleged conduct.

### 5. Breach of Warranty

Natera next argues that Plaintiffs' "implied warranty claims should be dismissed because Natera's PGT-A testing is a service, not a good," and that all of their warranty claims should be dismissed "because Plaintiffs did not provide Natera reasonable pre-suit notice of its alleged breaches of warranty." ECF No. 25 at 29.

Natera's first argument may have merit, but the Court finds the parties' briefing to be under-developed. Under California law,[5] "where the primary objective of a transaction is to obtain

---

[5] Plaintiffs assert implied warranty claims under the laws of each state and an express warranty claim under the Uniform Commercial Code, ECF No. 1 ¶¶ 294, 301–02, 311, but the parties'

15

services, the doctrines of implied warranty and strict liability do not apply." *Allied Props. v. John A. Blume & Assocs.*, 25 Cal. App. 3d 848, 855 (1972). To determine whether "a contract is one of sale or to provide services," courts "look to the essence of the agreement. When service predominates, the incidental sale of items of personal property does not alter the basic transaction." *Filmservice Lab'ys, Inc. v. Harvey Bernhard Enters., Inc.*, 208 Cal. App. 3d 1297, 1305 (1989).

Plaintiffs argue that this Court "recently determined that Defendant's prenatal tests were a good sold to consumers," but the cited portion of *In re Natera Prenatal Testing* discusses the learned intermediary doctrine and has nothing to do with whether the case involved a service or a good. ECF No. 34 at 23 (citing *In re Natera Prenatal Testing*, 664 F. Supp. 3d at 1007–08). Nor did the Court decide that question, which does not appear to have been raised, when it elsewhere denied Natera's motion to dismiss the plaintiffs' implied warranty claims. *In re Natera Prenatal Testing*, 664 F. Supp. 3d at 1010–12.

The cases relied on by Natera are also distinguishable. For example, in *Brandt v. Boston Scientific Corp.*, the Illinois Supreme Court explained that "[a] majority of foreign jurisdictions hold that a hospital's provision of a defective surgical device is primarily a transaction for services rather than goods so that no implied warranty of merchantability claim is available," but it went on to say that the plaintiff could "seek recovery from the manufacturer of the [device]" and had, in fact, brought such claims. 204 Ill. 2d 640, 654 (2003). Here, that manufacturer is Natera, and *Brandt* therefore does not support Natera's position.

Natera argues—but only on reply—that Plaintiffs themselves allege that Natera provides "services" under California law: "Defendant . . . has provided 'services' as defined by Civil Code §§ 1761(b) and 1770." ECF No. 1 ¶ 267. California Civil Code Section 1761 defines "goods" in subsection (a) and "services" in subsection (b). Although this allegation is included in the section of the complaint on Plaintiffs' CLRA claim, Plaintiffs' allegation that Natera provides "services" for purposes of that claim does not seem irrelevant to the determination of whether it provides a

---

briefs address only California law. The Court follows suit.

"good" or a "service" for warranty purposes. However, because the argument was raised only on reply, Plaintiffs did not have an opportunity to respond. If this issue arises in a motion to dismiss an amended complaint, the parties should consider all of the above.

Natera's second argument also appears to have merit. Plaintiffs do not dispute that they had an obligation to provide pre-suit notice of their warranty claims to Natera.

> To recover on a breach of warranty claim, the buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of any breach or be barred from any remedy." This notice requirement is designed to allow the seller the opportunity to repair the defective item, reduce damages, avoid defective products in the future, and negotiate settlements.

*Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 169 Cal. App. 4th 116, 135 (2008) (citation omitted) (quoting Cal. Com. Code § 2607(3)(A)). Plaintiffs allege that they provided pre-suit notice to Natera "of its CLRA violations," ECF No. 1 ¶ 278, but they do not allege that they provided pre-suit notice of alleged warranty violations. Nor does their opposition cite any authority for the proposition that a CLRA notice is sufficient to satisfy the requirement to provide pre-suit notice of a non-CLRA claim.[6]

### 6. Punitive Damages

Finally, Natera argues that Plaintiffs' requests for punitive damages must be dismissed because Plaintiffs did not comply with California Code of Civil Procedure Section 425.13, which requires that, "[i]n any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed." Cal. Civ. Proc. Code § 425.13(a). A court may enter such an order "on a motion by the party seeking the amended pleading and on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a substantial probability that the

---

[6] Plaintiffs respond to Natera's notice argument in a footnote, ECF No. 34 at 22 n.4, which, as discussed above, this Court generally does not consider. However, even considering the footnote, Plaintiffs argue only that they "mailed a notice letter to Defendant outlining the false representations and violations of consumer protection laws." *Id.* They do not specify whether the letter included any indication of potential warranty claims.

17

1  plaintiff will prevail on the claim pursuant to Section 3294 of the Civil Code." *Id.* The statute

2  defines "health care provider" as:

> any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code.

Cal. Civ. Proc. Code § 425.13(b). There is a split in authority as to whether Section 425.13 is substantive or procedural, but Plaintiffs do not contest that "[t]he rule is bound up with the state substantive cause of action for professional negligence" and thus applies in federal court. *Shekarlab v. County of Sacramento*, No. 2:18-cv-00047-JAM-EFB, 2018 WL 1960819, at *4 (E.D. Cal. Apr. 26, 2018); *see also, e.g.*, *Goldsmith v. CVS Pharmacy, Inc.*, No. CV 20-00750-AB (JCx), 2020 WL 3966004, at *12 (C.D. Cal. May 5, 2020) (reaching same result); *but see, e.g.*, *Jackson v. E. Bay Hosp.*, 980 F. Supp. 1341, 1352 (N.D. Cal. 1997) (declining to apply Section 425.13 after concluding that its "requirement is essentially a method of managing or directing a plaintiff's pleadings, rather than a determination of substantive rights").

Relying on *Kotler v. Alma Lodge*, 63 Cal. App. 4th 1381 (1998), Plaintiffs argue that Section 425.13 does not apply because Natera is not a "clinic, health dispensary, or health facility, licensed pursuant to Division 2 . . . of the Health and Safety Code." Cal. Civ. Proc. Code § 425.13(b). However, Natera does not claim to have been licensed under the Health and Safety Code, and Plaintiffs ignore that Section 425.13 also applies to claims involving "any person licensed or certified pursuant to Division 2 . . . of the Business and Professions Code." *Id.* The Court has taken judicial notice of Natera's annual clinical and public health laboratory licenses from the California Department of Public Health, each of which licensed Natera "[i]n accordance with the provisions of Chapter 3, Division 2 of the Business and Professions Code." ECF Nos. 26-11 to 26-14 (emphasis added). Moreover, Plaintiffs do not address, let alone attempt to distinguish, a California state court's finding that "Natera is a health care provider within the meaning provided in Code of Civil Procedure section 425.13, subdivision (b)." Order re Defs.'

Dems. & Mots. to Strike First Am. Compl. at 8, *A.P. v. Natera, Inc.*, No. 21Civ06237 (Cal. Super. Ct. San Mateo Cnty. Apr. 18, 2023). Because the Court concludes that Natera is a "health care provider" as defined in Section 425.13(b), it dismisses Plaintiffs' requests for punitive damages without prejudice to Plaintiffs' filing, at an appropriate time, a "motion allowing the filing of an amended pleading that includes a claim for punitive damages." Cal. Civ. Proc. Code § 425.13(a).

## CONCLUSION

Natera's motion to dismiss is granted. Plaintiffs' claim for punitive damages is dismissed without prejudice to filing, at an appropriate time, a motion under California Civil Procedure Code Section 425.13(a). All other claims are dismissed with leave to amend.

If Plaintiffs wish to file an amended complaint, they shall consider the reasoning contained in this order and must file their amended complaint within 21 days of the date of this order. Failure to file a timely amended complaint will result in dismissal of this case with prejudice.

The case management conference scheduled for August 19, 2025, is continued to November 18, 2025, at 2:00 p.m. An updated joint case management statement is due November 12, 2025.

Natera's motion to continue, ECF No. 45, is denied as moot.

**IT IS SO ORDERED.**

Dated: August 4, 2025



JON S. TIGAR
United States District Judge